SCHOOL DISTRICT OF OMAHA, COUNTY OF DOUGLAS, STATE OF NEBRASKA, ET AL., APPELLEES, V. STATE BOARD OF EDUCATION ET AL., APPELLANTS.

187 N. W. 2d 592

Filed June 4, 1971. No. 37458.

See 186 Neb. 170, 181 N. W. 2d
861, for original opinion.

Clarence A. H. Meyer, Attorney General, and Harold Mosher, for appellants.

Leo Eisenstatt and J. Patrick Green of Eisenstatt, Higgins, Kinnamon & Green and William Ross King, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

This case was previously reported at 186 Neb. 179, 181 N. W. 2d 861. On motion for rehearing we granted reargument. Our previous opinion affirming the judgment of the district court is withdrawn and the judgment of the district court is reversed and the cause remanded with directions.

Under sections 4, 5, 7, 8, and 11 of L. B. 448 (Laws 1967, chapter 514), providing for state aid to public school districts, the total amount of state aid for the School District of Omaha was computed for the school year 1968-69 to be $5,661,999. Under the limitation provisions of section 12 of the act, the State Board of Education limited the amount of aid to the School District of Omaha to $4,165,114. This reduction was required to bring it within the maximum 8 percent increase of the preceding year allowable under subsection (2) of section 12. The state prescribed aid, therefore, was cut in the

sum of $1,496,885. Under the provisions of section 12, the School District of Omaha filed an application for relief because of "undue hardship" as provided for in subsection (2) of section 12. On review the district court determined that section 12 (the limitation section) did not apply. The court ordered the State Board of Education to recalculate the amount of aid to Omaha and to stay further action. The State Board of Education appeals to this court. We reverse the judgment of the district court.

In order to understand this case it is necessary to review the pertinent facts and the sections of the statutes involved and to interpret them in the light of the purposes of the overall scheme and design of L. B. 448. The essential facts are not in dispute. The Legislature did not fully fund the act, and it was stipulated that the Legislature of the State of Nebraska at its 1967 legislative session for the biennium ending June 30, 1969, appropriated the sum of $25,000,000 for distribution among the school districts of the State of Nebraska pursuant to L.B. 448 (Laws 1967, chapter 514), sections 79-1330 to 79-1344, both inclusive, R. S. Supp., 1967.

Section 79-1333, R. S. Supp., 1967, provides that all state financial assistance shall be *based* upon the annual financial reports of such districts as required by section 79-451, R. R. S. 1943, and shall be paid in equal installments on the first day of December and the first day of April of the *following fiscal year*.

Section 79-451, R. R. S. 1943, provides that on or before July 20 the secretary of Class V districts shall deliver to the county superintendent a report showing the whole number of children belonging to the district between the ages of 5 and 21 years.

Also on or before November 1 two reports, one an end of the school year annual statistical summary and one an annual financial report showing number attending school under 5 and over 21 and other information including qualified teacher hours; teacher wages; amount

of money received from the county treasurer and the amount expended; the *number of mills levied for all school purposes*; the amount of bonded indebtedness; and *other facts and statistics as directed by the Commissioner of Education*. Such reports shall be submitted to the State Board of Education by Class IV and V school districts on or before the first day of November of each year. (Omaha is a Class V district.)

Under the provisions of L. B. 448 (sections 79-1330 to 79-1344, R. S. Supp., 1967), *"Unless the context otherwise requires * * ***

"(3) Per pupil cost shall mean a district's current operating expense for the *preceding* year as shown in the district's annual financial report to the State Department of Education, divided by the average daily membership of resident and nonresident pupils for the *preceding* school year." (Emphasis supplied.)

The financial support payable out of the State Foundation and Equalization Fund is provided in the statutes in stated amounts for each of several categories. Deductions are provided for late reports, *failure to levy taxes in prescribed amounts*, etc. The method used in determining the total base amount due Omaha under sections 4, 5, 7, 8, and 11 of the act appears to have been correct.

The act provided comprehensively for school aid in proportionate amounts to every school district in the state. The act also provided for pro rata funding in the event that the Legislature did not fully fund the act.

We are called upon in this case to construe L. B. 448, and in construing a legislative act resort may be had to the history of its passage. Chicago, B. & Q. R.R. Co. v. Amack, 112 Neb. 437, 199 N. W. 724. A proponent of this bill, Senator Jerome Warner, succinctly stated the reasons and purposes, as pertinent to the issues herein, to the Legislature's Committee on Education as follows: "The following constitute my reasons for this bill and the purposes which are sought to be accomplished there-

by: The purpose of LB 448 is to provide a formula for the distribution of state aid to public school districts. *It is a Foundation Equalization Act.* Under the foundation portion every school district in the state would be eligible to receive the amount of money prescribed in the bill on a per pupil basis, * * *. The *equalization* portion is for the purpose of equalizing costs between school districts. To qualify for equalization aid, a school district must levy a minimum of 22 mills if it is a Class 2, 3, 4 or 5 District; 15 mills for Class 1 District and 12 mills for a Class 6 District. The equalization aid is based upon $450.00 per pupil, one through six, $225.00 for kindergarten, $500.00 grades seven and eight and $550.00 for grades nine through twelve or 108% of the previous years per pupil cost whichever is less. These amounts times the respective number of students in average daily membership in each of the grades minus the other sources of income to the district including the amount raised by the minimum mill levy, the foundation aid and other sources of income, the difference between these equals the equalization aid. * * *

"The bill also has a provision for an appeal procedure made to the State Board of Education to *use the current years average daily membership for a school if it has had an increase in the number of students as prescribed in this bill.*

"The bill also provides for the pro-rating of a fund in proportion to what the district would have received of the full amount in the event that the Legislature appropriates less than the amount necessary for full funding of the bill. * * *

"In addition the bill has an over-all limit in the increase in per pupil cost per year which is for the purpose of insuring that any state aid is *used to reduce local mill levy and is not just additional spending by the local district. This is to insure the concept of replacement of local property tax.*" (Emphasis supplied.)

It would unduly lengthen this opinion to fully de-

scribe the background of the different types of grants under the act. We will refer to them as the foundation grant, the incentive grant, and the equalization grant. Pursuant to the data furnished the State Board of Education under the prescribed application forms for the grant, the Omaha calculation appears to be as follows:

| | | | |
|---|---|---|---|
| Foundation grant, 79-1334 | | - | $ 1,622,761.80 |
| Incentive grant, 79-1340 | | - | 458,862.00 |
| Equalization grant, 79-1336 | | - | $27,626,756.00 |
| plus | 79-1337 | | 752,031.25 |
| | | | $28,378,787.25 |
| less | 79-1338 | | 14,057,272.07 |
| | | | $14,321,515.18 |

In other words, if L.B. 448 had been fully funded and if the School District of Omaha had not exceeded the 8 percent limitation of section 79-1341, R. S. Supp., 1967 (section 12, L.B. 448), the School District of Omaha would have received $14,321,515.18 in equalization aid. Because the act did not fully fund, the pro rata share funds amounted to $5,661,999. This figure was reduced to $4,165,114 because section 79-1341, R. S. Supp., 1967 (section 12 of the act), provides that the per pupil cost may not increase more than 8 percent above the average cost for the preceding year of 1967-68.

With this background, we approach the first issue of the case. It is whether or not the limitation section, 79-1341, R. S. Supp., 1967 (section 12 of the act), is applicable. "Sec. 12. For a district in which *actual* per pupil cost, in any *particular* year, exceeds the total financial support prescribed by sections 7, 8, and 11 of this act the following limitation shall apply: Notwithstanding the grant provisions of sections 4, 5, 7, 8, and 11 of this act, funds received under this act, when added to operating funds received from all other sources, shall not exceed the larger of the following amounts:

"(1) The sum necessary to support an increase in

per pupil expenditures which, when added to the increases and decreases of the four preceding fiscal years, results in a mean annual increase in per pupil costs for the five-year period of eight per cent; or

"(2) The sum necessary to support a per pupil cost eight per cent above that of the preceding year; *Provided,* a district which may suffer undue financial hardship because of such limitations, such hardship being a result of an abnormal change in enrollment, depreciation in the value of school properties, alteration of property values within the district, or other abnormalities or emergencies of similar magnitude or consequence may file a written application for relief with the State Board of Education, which may grant whatever relief, if any, it deems appropriate by altering the percentage limitations of this section."

The exact issue in this case involves the distribution of funds for the 1968-69 school year. We feel that it is self-evident and that the "particular year" referred to in the statute means the 1968-69 school year. This appears, from the record, to have been the year considered both by the School District of Omaha and the State Board of Education at the hearing before the State Board of Education, such hearing being instigated by the Omaha School District for the only purpose of securing relief under the hardship issue of the act. The district court, although finding erroneously that section 12 did not apply, did find in its memorandum order after its hearing on appeal that the *particular* year involved in the computation was the 1968-69 school year.

To arrive at the limitation on the amount due the Omaha School District we must determine the per pupil cost. Unless the context otherwise requires, we must take the district's current operating expense for the *preceding* year (1967-68) and divide it by the average daily membership of resident and non-resident pupils for the *preceding* school year (1967-68). The financial support payable for 1968-69 can only exceed by up to 8

percent (section 12, subsection (2)) the sum necessary to support a per pupil cost for 1967-68, the total of which would be the cost per each individual pupil multiplied by the number of pupils.

The district court held that the *actual* per pupil cost meant the *total* per pupil cost for 1967-68. Naturally, the *total* per pupil cost for 1967-68 could not exceed by 8 percent nor any other amount the already determined per pupil cost for 1967-68. The only logical possible conclusion is that *actual* per pupil cost means the *actual* per pupil cost for the *particular* year for which the distribution is being figured, to wit 1968-69. The context requires this construction. If it does not, the word *actual* means nothing and we are saying that the total per pupil cost does not exceed the total per pupil cost, therefore the limitation does not apply because it is not 8 percent more than the per pupil cost. We would be comparing total per pupil cost for 1967-68 with total per pupil cost for 1967-68.

It is elementary that a statute must be given a reasonable construction to accomplish the objectives and purposes of the act. It appears that the limitation section is designed to accomplish equalization of the aid among all the school districts and not permit arbitrary increases in the per pupil cost at the expense of the other school districts in the state. The 8 percent limitation is designed to insure this equalization and it seems to us that such a provision is fundamental to the purposes of the act. A chaotic condition could easily result from permitting an unlimited increase in costs by the different districts in order to secure the maximum aid possible.

The semantical analysis of the language of the different sections of the act supports our conclusion. Any difficulty with reference to the meaning of per pupil cost is eliminated in all of the other sections of the act besides section 12, because each section of the act (except section 12) in itself defines per pupil cost as meaning the per pupil cost in the next preceding year. Under

section 2, 79-1331, R. S. Supp., 1967, the definition of per pupil cost would have required the same interpretation actually spelled out, *unless the context otherwise required*. We note in only one place in the act is the term *"actual per pupil cost in any particular year"* used. We assume that the Legislature, by using a different phraseology in this section of the statute intended to give meaning to the admonition contained in section 2 that per pupil cost might and should be construed in light of the context. As we have pointed out the words *"actual"* and *"particular year"* could only refer in a meaningful sense to a comparison to the years 1968-69.

This act was designed to fit the actual realities of school district financing. It is clear that the amount of the distribution for the *particular* year 1968-69 is *based* upon reports for 1967-68. The reports for 1968-69 will not be filed until after the school year is completed. While the statute does not say that the 8 percent limitation is to be determined by the number of students registered and the budget for 1968-69, that is the only possible source. It would hardly seem logical to say that while payments are to be distributed in December and April of the 1968-69 year they would have to wait until reports for 1968-69 were filed in July and November 1969, following the end of the 1968-69 school year to determine what the actual per pupil cost had been. By October 1968 they will know how many pupils are in school. They will know the amounts of the teachers' salaries. They will have budgeted the amounts needed for all expenses.

To make a rather complex story short, the Legislature told the school districts, in effect, that if they would make a certain minimum levy, provide a certain quality education, the Legislature would appropriate the funds to insure the expense of per pupil cost established in the next preceding year or on the last 5-year average (section 12, subsection (1)). The Legislature also told the school districts that since the total amount they

funded would be divided among all of the school districts in the state they would not permit a sudden or disproportionate increase of their per pupil cost basis. They also sought to enforce the principle that the purpose of state aid was to reduce the local levy and not for the purpose of supplementing it. We therefore hold that the limitation section, section 12, 79-1341, R. S. Supp., 1967, is applicable.

The second issue which was not specifically ruled on by the district court since it held it was not applicable, arises from the following proviso in section 79-1341, R. S. Supp., 1967: "*Provided,* a district which may suffer financial hardship because of such limitations, such hardship being a result of an abnormal change in enrollment, depreciation in the value of school properties, alteration of property values within the district, or other abnormalities or emergencies of similar magnitude or consequence may file a written application for relief with the State Board of Education, which may grant whatever relief, if any, it deems appropriate by altering the percentage limitations of this section." This refers to the 8 percent limitation.

The Omaha School District filed such a written application for relief. It stated that the hardship designations of abnormal change in enrollment, depreciation in value of school properties, and alteration of property values within the district were not applicable. The claim for relief was based upon the last designation to wit "* * * other abnormalities or emergencies of similar magnitude or consequence."

We observe that the computations made by the School District of Omaha in its application for relief under section 12, were on the forms provided it by the State Department of Education. As we have stated the hearing involved solely a request for relief from the 8 percent limitation, section 79-1341, subsection (2), R. S. Supp., 1967. Again, the pro rata funding under the other provisions of the act came to $5,661,999. But the

application of the 8 percent limitation decreased this amount by $1,496,885. Was the action of the State Board of Education arbitrary and unreasonable and does the record support it in denying relief under the hardship clause and enforcing the 8 percent limitation of section 12, subsection (2)? We fail to find in the record any showing or any evidence that the denial was unreasonable, arbitrary, or capricious. The evidence shows, and we agree, that the School District of Omaha, as almost all school districts are, was hard pressed for financial support. The record shows that the State Board of Education agreed that the Omaha School District needed the money and was perhaps suffering from hardship. The record also shows that the State Board of Education received similar applications from some 50 other school districts asking for similar relief. Consequently the State Board of Education properly invoked the equalization principle which is the fundamental provision of the act. It seems clear to us that the board was supported in a finding that the School District of Omaha's hardship was not sufficiently abnormal as to require relief at the expense of the other school districts but was of similar degree and magnitude to those of all of the school districts whose applications have been denied. The burden of proof is upon the applicant for relief and the record is devoid of any showing that the School District of Omaha was being discriminated against. The board voted 5 to 1 to deny the Omaha application. We will not burden this opinon with a detailed recital of the reasons given by the majority of the board. Not only should considerable weight be given to the findings of the State Board of Education under the generalized powers granted to it under this section of the act; but we can find no showing that it acted arbitrarily, capriciously, or unreasonably. We assume that the State Board of Education and its staff had the necessary expertise to study the problems of all of the districts having hardship problems. The term "hardship" in the

context of the meaning, purpose, and the funding of this act can only be reached by a comparative study of the hardship of the other school districts in the state. The board made the determination that the case for hardship of the School District of Omaha was not so abnormal as to be above and beyond that of other school districts and require rectification by an allocation of money which would necessarily have to come from the pockets of the other school districts. It is significant that the School District of Omaha could have eliminated its financial hardship by increasing its tax levy by only 2 mills. Even then there was no reduction in its tax levy which is one of the purposes of the act. Its 1967-68 levy was a fraction over 42 mills and the 1968-69 levy was a fraction over 44 mills. The record shows that Kearney levied 55.09 mills, Grand Island 58.43, Hemingford 94.44, St. Edward 64.63, Merriman 107.48, Valentine 68.04, and Lincoln 55.32. Not without weight is the observation of a board member who stated that if the application of the School District of Omaha were granted then all of the other cases would have to be opened up and again the board would be faced with a problem. Consequently, the limitation section of the statute was followed which in effect is a format for the board to use in determining equality among the various school districts.

For these reasons we hold that section 79-1341, R. S. Supp., 1967, section 12 of L.B. 448 is applicable to the School District of Omaha in this case and that the action of the State Board of Education in denying relief from the 8 percent limitation is sustained by the record and is not arbitrary, capricious, or unreasonable.

The judgment of the district court is reversed and the cause remanded with directions to dismiss the petition on appeal of the School District of Omaha.

REVERSED AND REMANDED WITH DIRECTIONS.

BOSLAUGH, J., dissenting.

The term, "per pupil cost," is defined in section 79-

1331, R. S. Supp., 1967, to mean the current operating expense for the *preceding year* divided by the average daily membership for the *preceding school year*. Thus, the "actual per pupil cost, in any particular year," is by definition the per pupil cost for the year preceding the particular year.

The term is used in only two sections of the 1967 act. There is nothing in the context of the act that requires or justifies a construction that ignores the definition set out in the act.

Section 79-1341, R. S. Supp., 1967, requires a comparison of the *actual* (not estimated) cost for 1967-68 with the total financial support prescribed for 1968-69. Cost on a per pupil basis cannot be compared with total financial support. It is necessary, as the trial court found, to compare total operating cost with total financial support. Since the former does not exceed the latter, the limitation prescribed in the section is not applicable.

The majority opinion suggests that "a chaotic condition could easily result from permitting an unlimited increase in costs by the different districts in order to secure the maximum aid possible." The only districts that could receive increased aid through increased expenditures, under the 1967 act, were those districts in which per pupil expenditures fell below the amounts specified in section 79-1336, R. S. Supp., 1967. Both limitation provisions have now been repealed. See Laws 1969, c. 467, p. 1621.

In my view of the case, it is not necesasry to reach the hardship issue.

McCown, J., joins in this dissent.

Smith and McCown, JJ., dissenting.

The majority opinion misconstrues the statute. It gives the issue of undue hardship short shrift. We concur with the dissenting opinion by Boslaugh, J., regarding statutory construction, but we also dissent respecting the hardship issue.

The majority opinion states that the purpose of the

act was to provide comprehensive school aid in proportionate amounts to every school district in the state. We do not so read the text, and these facts cast a shadow over the majority view: In the fall of 1969 Nebraska led all other states in the numbers of operating and nonoperating school districts—1,420 and 400 respectively. See Simon and Grant, U.S. Department of Health, Education and Welfare Digest of Educational Statistics (1970).

We turn to the opening clause of section 12 of the act. The majority opinion insists that 1968-69 is the year for determination of actual pupil cost; yet it uses operating costs and average pupil membership in 1967-68 to make that determination. The approach is incorrect. It appears either to invert the statutory relationship between actual pupil cost and total financial support or to read the opening clause completely out of the act.

We are told that any other construction of the opening clause of section 12 would make the relationship between cost and support every year an invariable. The argument overlooks a fair construction of the statute: Prescribed support for one year would become an item of cost the next year.

Other states have determined school aid in a given year by revenue, costs, and membership in the prior year. See, Mort, Reusser, and Polly, Public School Finance 44-49 and 265; Johns and Morphet, Financing the Public Schools 283 (1960); Zenith School District No. 32 v. Peterson, 81 N. W. 2d 764 (N. D., 1957).

At the hearing before the state board on the issue of undue hardship, the Omaha district appeared by its president, Charles A. Peters, and its superintendent, Dr. Owen A. Knutzen. The board elicited minor instances of inefficiency, and greater inefficiency was probably inherent in a district of that size. One-half of all children in public schools of America attended schools located in 50 districts. Omaha ranked 38th.

Its student membership formed 20 percent of the state total and 90 percent of the Blacks.

The tragic plight of disadvantaged children in large urban school districts across the nation was well known. An urban crisis struck Omaha. In the year of passage of the state aid act one student was killed. Students boycotted schools. The buildings became targets of racial disturbances.

Dr. Knutzen poignantly declared: ". . . the fact of life is that we live today and for these children to-morrow. We cannot undo . . . yesterday . . .. Omaha . . . has 50 percent of all A.D.C. (child welfare) cases in Nebraska . . .. If that doesn't . . . spell human dis-aster in the consequences of the cost, I don't know what would." The burden of meeting the emergency fell upon the 1968-69 budget. The evidence stood unchal-lenged.

The technical staff of the Commissioner of Education for Nebraska recommended distribution of the money to Omaha on account of undue hardship. The commis-sioner, Dr. Floyd A. Miller, concurred, and he conveyed his recommendation to the board.

Sitting on the board was Robert G. Simmons, Jr., a resident of Scottsbluff and a practicing lawyer admitted to the bar in 1941. At the hearing this dialogue oc-curred: "Peters: . . . But . . . because we attempted to solve the problem, you are saying no . . .. Sim-mons: The Legislature said that . . . That's the trouble with the Omaha people, you don't realize that you are part of the State of Nebraska."

It is our opinion that this court misconstrues the stat-ute and that the state board acted arbitrarily. We would affirm the judgment of the district court, reaf-firming School District of Omaha v. State Board of Education, 186 Neb. 170, 181 N. W. 2d 861 (1970).

CLINTON, J., concurring.

I concur in the majority opinion. I add the following. At the hearing before the State Board of Education,

both it and the plaintiff school district construed the statute to make section 12 and its limitations applicable to the plaintiff. Its application for relief under the "hardship" provision was founded on the premise that the limitation of the section was applicable. Its appeal to the district court was primarily on that premise.

The legislative intent is to be sought, first of all, within the bounds of the statute itself. Set forth following are: 1. A draft of the statute as it ought to read if the plaintiff's present contention were correct. 2. A draft rewritten in accordance with the practical construction placed upon it by both parties until otherwise interpreted by the trial court, which draft also contains my interpretative comments.

Section 12, if drafted in accordance with the plaintiff's present contention that "actual per pupil cost, in any particular year" means per pupil cost in the year preceding the year for which aid is being computed, would read as follows. The portions in brackets and/or parentheses indicate the changes required by such contention.

"For a district in which actual per pupil cost [for the year preceding the year for which aid is being computed (or is to be paid)], exceeds the total financial support prescribed [for the year for which aid is being computed (or is to be paid)], by sections 7, 8, and 11 of this act the following limitation shall apply: Notwithstanding the grant provisions of sections 4, 5, 7, 8, and 11 of this act, funds received under this act [in the aid year], when added to operating funds received [in the aid year] from all other sources, shall not exceed the larger of the following amounts:

(1) [Not applicable]; or

(2) The sum necessary to support a per pupil cost eight per cent above that of the preceding

year; Provided, (here follow the hardship provisions)."

If section 12 were rewritten in accordance with the practical construction placed upon it by both parties until otherwise interpreted by the trial court, it would read as follows. Interpolated in brackets are my interpretative comments indicating my analysis of all versions, including that of the statute itself.

"For a district in which the per pupil cost for the year in which aid is being computed (or for which it is to be paid), exceeds the total financial support prescribed by sections 7, 8, and 11 [the foregoing clause under any version of the section can only refer to the year for which aid is being paid], of this act the following limitation shall apply: Notwithstanding the grant provisions of sections 4, 5, 7, 8, and 11 of this act, funds received under this act, [the immediately foregoing clause under any version can only refer to year for which aid is being paid], when added to operating funds received from all other sources [again this clause under any version can refer only to the aid year (and most significantly determination of operating funds must be based upon budget figures and not actual expenditures)], shall not exceed the larger of the following amounts:

(1)   [Not applicable]; or

(2)   The sum necessary to support a per pupil cost eight per cent above that of the preceding year."

Plaintiff concedes in its brief, page 29, under its theory of a condition precedent, that to read the section literally results in an absurdity. It then proposes to solve the quandry by reading something into the statute that is not there. This is a concession by it, at least, that the section is ambiguous. It therefore must be analyzed to try to determine the legislative intent.

From the analyses of section 12, which I have set forth earlier, it seems apparent to me that where this

section speaks of "actual per pupil cost, in any particular year," it is referring to a cost based upon budget figures for the aid year and a per pupil cost for the year based upon that budget.

I say this because based upon the analyses it is, to me, indisputable that the clause "the total financial support prescribed by sections 7, 8, and 11" necessarily refers to the support for the aid year, for it, by the very context, relates to the phrase "in any particular year". Therefore the phrase "in any particular year" refers to the year for which aid is being computed. The original opinion in this case concedes this.

Even more conclusive, in my judgment, is the relation of the phrase "in any particular year" to the clause "funds received under this act." It obviously refers to funds received in the aid year and that under the statute is "in any particular year."

Then we get to the clause "when added to operating funds received from all other sources." It is apparent that the determination of these funds can be made only with reference to the budget figures. Yet surely the statute is referring again necessarily to "funds received from all other sources" "in any particular year."

The plaintiff's interpretation of the statute necessarily requires that the phrase "in any particular year" be used in the very same sentence to mean both "the preceding year" and "the year for which aid is being computed and funds received" (quotation marks supplied on the last). This obviously cannot be. It necessarily follows that in this section the term "actual per pupil cost" must, because of the context, not be equated with the definition in subsection (3) of section 2.

The three clauses or phrases by the very language of the act refer to matters which are determinable only with reference to the aid year and by the terms of the section all relate back to "any particular year." It seems to me that it follows as night the day that "actual per pupil cost in any particular year" can refer only

to a cost based upon the aid year budget. The one term (used only once) cannot have two meanings in the same sentence.

The uncontradicted evidence is that the plaintiff in its application, exhibit 3, to the State Board of Education for aid computed its estimated per pupil cost for 1968-69 as $494.42. It used that figure to determine the applicability of the limitation of section 12. Total financial support per pupil under sections 7, 8, and 11 would be $465.31 or $476.81. See original opinion, 186 Neb. 178, 181 N. W. 2d 861, 863. The 108 percent of the per pupil cost for 1967-68 was $469.67 and this constituted the limitation for 1968-69. Section 12 did apply to plaintiff.

Additionally we offer the following grounds for reversal. A party may not on review change the theory on which the case was tried or the ground or action of defense relied upon by him below. 5 C. J. S., Appeal & Error, § 1503, p. 863. Before the State Board of Education, its theory was the section 12 limitation applied. In addition, both the State Board of Education and the plaintiff interpreted the section 12 limitation to apply. Contemporaneous construction may be considered by the court. 82 C. J. S., Statutes, § 357, p. 758. See, also, State v. Equitable Life Assur. Soc., 68 N. D. 641, 282 N. W. 411. The case of Zenith School District No. 32 v. Peterson (N. D.), 81 N. W. 2d 764, cited in the dissenting opinion of Judge Smith has no application. The reversal of the judgment of the trial court is required.